IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DEBORAH ANN MCCUNE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 1:09-cv-1248 (AJT/JFA) |
| NATIONAL CITY BANK, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

This matter came before the Court on January 22, 2010 on the Motion to Dismiss Plaintiffs' Complaint filed by Defendant National City Bank ("National City") (Doc. No. 6). Upon consideration of the motion, the opposition thereto, and the arguments of counsel, Defendant National City Bank's Motion to Dismiss Plaintiffs' Complaint (Doc. No. 6) is granted in part and denied in part.

### I.     The Facts as Alleged in the Complaint

On November 5, 2009, Plaintiffs Deborah Ann McCune and Craig McCune (hereinafter referred to as "Plaintiffs" or "the McCunes") filed a three count Class Action Complaint (Doc. No. 1) (hereinafter referred to as the "Complaint") alleging violations of (1) the Bank Holding Company Act's anti-tying provisions, 12 U.S.C. § 1972 (Count 1); (2) the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (Count 2); and (3) the implied contractual duty of good faith and fair dealing under Ohio state law (Count 3).

The McCunes own, as tenants by the entirety, real property located in Fairfax County, Virginia. Complaint at ¶ 11. On or about July 27, 2007, the McCunes entered into an Equity Reserve Agreement ("the Agreement") with National City for a home equity line of credit. A Credit Line Deed of Trust securing the McCunes' obligations

under the Agreement was recorded as a second deed of trust that was second in priority to a first deed of trust in favor of Mellon Bank, N.A., through whom the McCunes obtained their original loan to purchase the property. Complaint at ¶ 13.

Under the Credit Line Deed of Trust, the McCunes agreed "not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by [a superior] lien document without [National City's] prior written approval." Complaint at ¶ 15. In 2009, after they obtained their credit line from National City, the McCunes sought to refinance their Mellon Bank loan and, for that purpose, asked National City to continue the subordination of its Credit Line Deed of Trust to the deed of trust securing the refinanced loan, which would otherwise need to be junior to National City's Credit Line Deed of Trust.

According to the Plaintiffs, "National City had (and has) no legitimate business reasons to deny this request." Complaint at ¶ 15. In this regard, the McCunes allege that in late 2008, amid concerns about National City's capitalization, the PNC Financial Services Group, Inc. acquired National City and affiliated entities for approximately $6.1 billion and thereafter received $7.6 billion from the federal government under the Emergency Economic Stabilization Act to "enhance" National City's capitalization. Complaint at ¶ 6. Earlier in 2008, as National City's fortunes were fading, National City "unilaterally and unlawfully changed its policy on subordinating second mortgages it had previously sold to consumers, all in an effort to increase its sales and margins at the expense of troubled homeowners." Complaint at ¶ 7. As alleged, this policy (hereinafter referred to as the "Subordination Policy"), "adopted in February 2008, imposed an arbitrary and blanket prohibition, regardless of circumstances, on subordinating National

City's second mortgages to new or modified senior debt secured by non-National City liens having priority over theirs." Complaint at ¶ 8. According to the Plaintiffs, under the Subordination Policy there is no procedure for borrowers to seek exceptions (Complaint at ¶19) and further:

> Under this policy, if National City owns a homeowner's second mortgage, the only way they can refinance their first mortgage is by agreeing to terms dictated by National City. National City's policy jeopardizes the financial welfare of its customers and has the foreseeable effect of unnecessarily forcing homeowners into default and foreclosure, even as its competitors are willing to refinance the borrower's first trust at a lower, more affordable market interest rate.

Complaint at ¶ 9. Based on these facts, National City, "pursuant to its policy, arbitrarily and unreasonably withheld its consent to subordination." Complaint at ¶ 19. In sum, the Plaintiffs conclude that "[t]his policy is not only unfair to consumers and jeopardizes home ownership, it is also unlawful." Complaint at ¶ 10.

## II. Analysis

### A. Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the Complaint and does not resolve contests surrounding the facts or merits of a claim. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Hatfill v. The New York Times Co.*, No. 04-cv-807, 2004 WL 3023003, at *4 (E.D. Va. Nov. 24, 2004) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In considering a

3

motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted). Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*; *see also Bd. of Trustees v. Sullivant Ave. Properties, LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007).

In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

### B. Bank Holding Company Act Claim

Count 1 of Plaintiffs' Complaint alleges that National City has violated 12 U.S.C. § 1972(1)(E). That provision provides:

> 1) A bank shall not in any manner extend credit, . . . or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement
> \* \* \*
> (E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

Section 1972(1)(E), as the other provisions of Section 1972(1), is one of the so-called anti-tying provisions of the Bank Holding Company Act ("BHCA").[1] National City seeks dismissal of Count 1 on the grounds that the BHCA does not apply to the subordination provision, and its alleged Subordination Policy. More specifically, National City argues: (1) the Subordination Policy is not within the scope of the BHCA because National City did not condition an "extension of credit" or vary the consideration for credit when it declined to subordinate its loan to a new financing; (2) Plaintiffs do not adequately allege that two "products" were tied together, as required; and (3) any "tying" embedded in its Subordination Policy is permitted under the BHCA under the "traditional bank products" exception and Plaintiffs have failed to plead, as required in order to avoid that exception, that the Subordination Policy is an "unusual" banking practice. The Court assumes as true for the purposes of this motion that National City does, in fact, have a blanket policy that it will not agree to subordinate its equity line loan to a new loan obtained through another lender, without exception.

*1. Whether the Subordination Policy involves "an extension of credit."*

---

[1] There has also been an extensive debate between the parties concerning whether this section is properly characterized as an "anti-tying" provision. On the one hand, the Plaintiffs contend that "this case has nothing to do with tying." Plaintiffs' Brief in Opposition at 1. National City claims that this section is "simply a 'negative tying' provision." Rebuttal Brief in Support of Defendants' Motion to Dismiss (Doc. No. 14) at 1. The provision is one of five prohibitions on imposing certain conditions on credit transactions, both affirmative and negative, and the Plaintiffs have, in fact, characterized its lawsuit as seeking redress for a violation of the "Bank Holding Company Act's anti-tying provisions." Complaint at ¶ 1. In any event, this Court's analysis is not affected by how this Section is characterized.

5

Section 1972(1)(E) applies to any extension of credit or furnishing of a "service."[2] National City first argues that there is no BHCA claim because it did not extend or modify any credit in connection with its refusal to subordinate pursuant to the Subordination Policy. More specifically, National City argues that since the contract was signed on July 27, 2007 and the Subordination Policy went into effect on February 18, 2008 (Complaint at ¶¶ 12, 19), the Subordination Policy did not impose a condition at the time the credit was extended through the Agreement. Likewise, National City argues that the Subordination Policy did not "vary" the consideration for its extension of the home equity line of credit or any services furnished in connection with that extension.

The BHCA does not define the term "extension of credit." Nevertheless, courts have construed the phrase liberally to include nearly any credit decision.[3] For example, even forbearance on the collection of an outstanding loan has been deemed to be an "extension of credit." *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F. Supp. 542, 553-55 (S.D.N.Y.1985). The court in *Nordic Bank PLC* explained that

> Nowhere does the legislative history or the language of the BHCA define the term 'extension of credit.' That term must be construed to accord with the underlying purpose of the anti-tying provisions. A particular practice should be considered an 'extension of credit' if it manifests the improper use of economic leverage that the Act seeks to prevent.

*Id.* at 554. *See Amerifirst Properties, Inc. v. F.D.I.C.*, 880 F.2d 821, 823-24 (5th Cir. 1989) (affirming the lack of guidance in the legislative history); *accord Tri-Crown, Inc.*

---

[2] By its own terms, Section 1972 only proscribes certain behaviors by banks: "[a] bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing [on certain conditions or requirements.]"

[3] *See* cases collected in Timothy D. Naegele, The Bank Holding Company Act's Anti-Tying Provision: 35 Years later, 122 BANKING L.J. 195, 199 (2005).

*v. American Federal Sav. & Loan Ass'n*, 908 F.2d 578, 584 (10th Cir. 1990). The Fourth Circuit has also adopted a broad application of Section 1972, holding that "[t]he purpose of Section 1972 is 'to prohibit anti-competitive [banking] practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service that they desire." *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 469 (4th Cir. 1986) (*quoting* Rep. No. 1084, 91st Cong. 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5519, 5535).

The Court concludes that the challenged Subordination Policy is subject to review under the BHCA, and Section 1972(1) in particular. Under the Subordination Policy, Plaintiffs' request to subordinate its existing loan to Plaintiffs' refinanced loan necessarily placed in National City's hands the opportunity to exercise economic leverage and engage in anti-competitive practices. Moreover, National City's disposition of Plaintiffs' request necessarily involved a decision pertaining to Plaintiffs' credit. In short, the Subordination Policy involved National City and the Plaintiffs in a credit based interaction under circumstances that the BHCA is intended to regulate.

*2. Whether there are two tied products*

National City next contends that the Plaintiffs failed to show an anti-competitive tying arrangement because they do not allege two distinct tied products. *See Faulkner Advertising Assoc., Inc. v. Nissan Motor Corp.*, 905 F.2d 769, 772 (4th Cir. 1990) ("In order to establish an illegal tying arrangement, a plaintiff must show that two separate and distinct product markets have been linked together.") (overturned on other grounds *en banc* in *Faulkner Advertising Assoc., Inc. v. Nissan Motor Corp.*, 945 F.2d 694 (4th Cir. 1991)). National City emphasizes in this regard that this requirement applies even

under Section 1972(1)(e), where the extension of credit is conditioned on an agreement not to purchase a second product from competing sellers, a so called "negative tie." *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir. 1994) (defining a negative tie and maintaining that the negatively tied products must be two distinct products).

The Plaintiffs have properly alleged an anti-competitive tying arrangement under Section 1972(1)(E). The Complaint alleges two distinct negatively tied products, National City's agreement to subordinate (product or service number 1), and restrictions on borrowings with a competitor, without National City's consent (product or service number 2).

2. *Whether the Subordination Policy is a "traditional banking product," an "unusual banking practice," or a condition that National City may "reasonably impose in a credit transaction to assure the soundness of credit."*

National City contends that Plaintiffs' home equity loan and the related Agreement are exempt traditional banking products and services. For this reason, National City contends that in order to avoid that exemption, the Plaintiffs must allege and prove that the Subordination Policy is an "unusual banking practice." For the reasons discussed below, this Court concludes that such a requirement, actually imposed only in Subsections A and C of Section 1972(1), should not be read into Subsection E.

Neither party has referred the Court to a case that specifically interprets Subsection E; and Subsection E does not appear to have been the subject of much judicial consideration. Rather, Section 1972 is often discussed without any specific reference to a particular subsection. *See, e.g., Sanders v. First Nat'l Bank of Trust Co. in Great Bend*, 936 F.2d 273, 278 (6th Cir. 1991); *Parsons Steel, Inc v. First Alabama Bank*

*of Montgomery, N.A.* 679 F.2d 242, 245 (11th Cir. 1982). Courts interpreting Subsections A and C have required proof of an "unusual banking practice" as an element of a claim under Section 1972 without explicitly restricting the requirement to Subsections A and C. Rather, in imposing the requirement, they have referred more broadly to "an anti-tying" claims generally. For example, in *McClain v. South Carolina Nat'l Bank*, 105 F.3d 898 (4th Cir. 1997), a case involving claims under Subsections A and C, the Fourth Circuit stated that "[a]n essential element of an anti-tying claim is that the banking practice at issue is unusual in the banking industry." *See also Kenty v. Bank One, N.A.*, 92 F.3d 384, 394 (6th Cir. 1996) ("To recover under the anti-tying provisions of 12 U.S.C.S. § 1972, a plaintiff must prove . . . the banking practice at issue was unusual in the banking industry."). No court has explicitly considered or concluded that the "unusualness" requirement applies to Subsection E. Nevertheless, based on these cases, National City argues that the Complaint is required, but fails, to allege that the Subordination Policy is an "unusual banking practice."

Unlike other subsections of Section 1972(1), Subsection E expressly exempts "a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit." That language provides a limited safe harbor for certain "negative" tying arrangements. In order to provide a comparable safe harbor for the "traditional banking products" exemption under Subsections A and C, courts have adopted the "unusual banking practice" language to describe practices outside of the exemption. *See Nesglo, Inc. v. Chase Manhattan Bank, N.A.*, 506 F. Supp. 254, 261 (D.P.R. 1980) (explaining the legislative history of the BHCA, and that the purpose behind the "traditional bank products exception" is a "concern for protection of the

9

soundness of the credit extended"). For these reasons, it would be duplicative to read the "unusual banking practices" requirement into Subsection E, which, by its express language, already protects reasonable practices that assure the soundness of credit. It would also inject possible confusion and complications in harmonizing the two different formulations of essentially the same exemption. The Fourth Circuit has not spoken to this specific issue; and the Court concludes with respect to this open issue that the Plaintiffs are not required to prove that the Subordination Policy is an "unusual banking practice" under Section 1972(1)(E).

With respect to the express exemption in Subsection E, a more extensive factual record will be necessary to determine whether the Subordination Policy is a condition or requirement National City may "reasonably impose to assure sound credit." On this point, National City concedes that "the reasonableness of its actions regarding the soundness of its credit would implicate facts outside the record." Rebuttal Brief in Support of Defendant's Motion to Dismiss Plaintiff's Complaint, (Doc. No. 14) at 5.

For the above reasons, the Court finds that Plaintiffs have adequately alleged a violation of Section 1972(1)(E) of the BHCA.

### C. Violation of Truth in Lending Act (Count 2)

Count 2 of the Complaint alleges a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and its implementing regulation 12 C.F.R. part 226. The relevant portion of this regulation prevents a lender from changing a contract unilaterally unless the borrower agrees to the change in writing, the change benefits the borrower, or the change is insignificant.[4]

---

[4] The relevant portion of the regulation reads:

National City contends that the Plaintiffs failed to allege that any part of their contract affirmatively obligated National City to consent to subordination, or even to consider subordination; and that without any such contractual obligation, National City could not have violated the applicable regulation through its Subordination Policy. The Plaintiffs respond that, under Ohio law, discretionary consent cannot be withheld arbitrarily or unreasonably, and that simply refusing to even consider discretionary requests is a breach of contract, citing *Littlejohn v. Parrish*, 839 N.E.2d 49, 50 (Ohio Ct. App. 2005), discussed *infra*.

The Plaintiffs have not stated facts sufficient to make their claimed violation of TILA plausible. *See Twombly*, 550 U.S., and *Iqbal v. Ashcroft*, 556 U.S. ___, 129 S.Ct. 1937 (2009). TILA prohibits a change in the terms of a contract.[5] Here, Plaintiffs allege not a change in the terms of the Agreement, but conduct that breached the Agreement, through an alleged violation of an implied duty of good faith under Ohio law. Even were Plaintiffs correct in their description of Ohio law, National City is not alleged to have changed the terms of the Agreement. While TILA prohibits changes in a contract, it does not provide causes of action for breaches of a contract that do not involve a change in the

---

(f) Limitations on home equity plans. No creditor may, by contract or otherwise:
\*\*\*
(3) Change any term, except that a creditor may:
\*\*\*
    (iii) make a specified change if the consumer specifically agrees to it in writing at that time.
    (iv) make a change that will unequivocally benefit the consumer throughout the remainder of the plan.
    (v) make an insignificant change to terms.

[5] For example, TILA prohibits changing a fixed-rate loan to a variable-rate loan, or the imposition of an annual fee where no fee existed before.

terms of the contract. Thus, even if National City breached the Agreement as alleged, it did not breach it in a manner that would violate TILA, and Count 2 will be dismissed.

**D. Breach of Contractual Duty of Good Faith and Fair Dealing (Count 3)**

In Count 3, the Plaintiffs assert that the Subordination Policy constitutes a breach of the implied duty of good faith recognized under Ohio law, relying nearly exclusively on *Littlejohn*, 839 N.E.2d at 50, where the Court of Appeals of Ohio, Ohio's intermediate appeals court, held that it was a fact question whether a note holder breached an implied duty of good faith when it refused to allow pre-payment of the note where the note permitted pre-payment without penalty, but that "[a]ny pre-payment shall be subject to approval of holder(s) hereof." National City Bank responds by citing to *Ed Schory & Sons v. Francis ("Schory")*, 75 Ohio St. 3d 433, 443–444 (1996), in which the Ohio Supreme Court essentially held that the implied duty of good faith does not qualify the exercise of clear contractual rights. *Id.* ("Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document.") (quoting *Kham & Nates Shoes No.2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-1358 (7th Cir. 1990)).

*Littlejohn* and *Schory* are clearly distinguishable from each other;[6] and the Court concludes that the holding in *Schory* requires this Court to dismiss Count 3. In this regard, Ohio courts, both before and after *Littlejohn*, have applied *Schory* in cases

---

[6] In *Littlejohn*, the court emphasized that their holding was driven by the impact the note holder's refusal to permit pre-payment had on the free alienation of property. *Littlejohn*, 839 N.E.2d at 52 ("[A] a nonpayable mortgage is surely a restraint on alienation."). Here, the Plaintiffs have not alleged facts that the alienation of their property has been impacted by the Subordination Policy.

12

involving contractual language sufficiently similar to that presented here to cause this Court to conclude as a matter of law that under Ohio law, the Subordination Policy does not violate an implied duty of good faith. *See B-Right Trucking Co. v. Interstate Plaza Consulting*, 798 N.E.2d 29, 37 (Ohio Ct. App. 2003) (holding that the good faith requirement "depends upon the language of the contract in each case") (citing *Schory*, 75 Ohio St. at 443).

The current state of Ohio law on the implied duty of good faith was recently reviewed in detail in *DavCo. Acquisition Holding, Inc. v. Wendy's Int'l, Inc.* ("*DavCo*"), No. 2:07-cv-1064, 2008 U.S. Dist. LEXIS 27108 (S.D. Ohio Mar. 18, 2008). In *Davco.*, the United States District Court for the Southern District of Ohio considered a claim that a defendant franchisor breached an implied duty of good faith in the parties' franchise agreement when it refused to approve additional suppliers or certain departures from contractual requirements. Under the franchise agreement, the parties agreed that the plaintiff "shall not purchase from any supplier until, and unless, such supplier has been approved in writing by Franchisor." *Id.* at *11. It also provided that the plaintiff-franchisee was prohibited from certain actions or practices "without the Franchisor's prior written consent." After reviewing Ohio law, the district court concluded that the "duty of good faith and fair dealing may not be invoked to override express contract terms." *Id.* at *18. It further concluded that "the implied covenant of good faith and fair dealing does not apply where a party to the contract has the absolute and exclusive authority to make the decision at issue." *Id.* at *19 (citing *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826–827 (6th Cir. 2003)). In rejecting the claim that the franchisor's reserved right to consent was qualified in some way by an implied duty of good faith, the

13

district court observed that the applicable language "imposes no express duty on [the franchisor] to investigate or apply any particular criteria in evaluating a proposed supplier." *Id* at *14–13. The Court also relied on Ohio Supreme Court case law for the proposition that "there can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." *Id.* at *18 (quoting *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 274 (1999)). [7]

Here, the Subordination Policy is based on clear and unqualified language in the Agreement that the Plaintiffs may not subordinate National City's lien without written permission from National City, and the Court concludes that Plaintiffs have failed to state a claim as a matter of law under Ohio law. Count 3 will be dismissed.

## IV. Conclusion

For the above reasons, the Court will deny defendant National City Bank's Motion to Dismiss Plaintiffs' Complaint (Doc. No. 6) as to Count 1 and grant its Motion to Dismiss as to Counts 2 and 3.

An appropriate order will follow.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 24, 2010

---

[7] The Middle District of Pennsylvania also refused in a contract dispute under Ohio law to adopt an expansive reading of *Littlejohn* on the grounds, among others, that such an expansive reading would conflict with *Schory. Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 712 (M.D. Pa. 2006) ("Ohio precedent belies [Plaintiff's] expansive interpretation of *Littlejohn*.").